398 So.2d 29 (1981)
The NATIONAL COMPANIES
v.
Robert D. BRIDGEWATER and Verna Craven Bridgewater et al.
No. 11727.
Court of Appeal of Louisiana, Fourth Circuit.
March 10, 1981.
Rehearing Denied May 15, 1981.
*30 Kenneth C. Scullin, in pro. per.
Gilbert R. Buras, Jr., New Orleans, for plaintiff-appellant.
Singer, Hutner, Levine, Seeman & Stuart, Ewell E. Eagan, Jr., Gerald F. Slattery, Jr., New Orleans, for defendants-appellees.
Before GARRISON, CHEHARDY and KLIEBERT, JJ.
CHEHARDY, Judge.
Plaintiff, The National Companies (National), appeals a summary judgment of the trial court in favor of defendants Robert D. Bridgewater and Verna Craven Bridgewater, et al., dismissing the plaintiff's principal demand and declaring that Robert D. Bridgewater and his partner, Edward B. Boettner, are the rightful owners of one "cotton compress," which was the subject of the legal action in the present case.
The record reveals that on February 9, 1979 the subject cotton compress was transferred by The National Companies[1] and Gulf Coast Industrial Properties Distribution Centers (Distribution Centers)[2] to The National Companies by authentic act, which reads in part:
"This grant, transfer and delivery is made for and in consideration of the obligation of The National Companies to remove the above described property from the premises and The National Companies does *31 hereby agree to cause the removal of the said property from the premises within sixty (60) days of written notice by Robert D. Bridgewater; and, in default whereof, The National Companies shall forfeit all of its right, title and interest in and to said property, which property shall revert to the ownership of Robert D. Bridgewater and Edward B. Boettner.
The above contract was signed by Kenneth C. Scullin and Robert D. Bridgewater.
Pursuant to the above agreement, Scullin was notified by a letter dated November 9, 1979, and signed by Bridgewater, that he should cause the removal of the cotton compress from the subject premises within 60 days of that notice.
On January 10, 1980, National filed suit against Bridgewater claiming that it was impossible for it to remove the cotton compress without a voluntary arrangement with Bridgewater and Boettner (who purchased Scullin's interest in the property on which the compress sits on October 3, 1979) because if removed it could cause serious and extensive damage to the existing slab and foundation and/or walls. Plaintiff also claimed that its attempt to negotiate an agreement for removal of the cotton compress was without success. The petition also asked the court to restrain the defendants from subjecting its property to a mortgage and to order defendants to permit removal of the property from its premises.
On January 15, 1980, defendants filed a petition in reconvention for temporary restraining order, preliminary injunction and permanent injunction, asking the court to declare Bridgewater and Boettner the owners of the cotton compress and preventing Scullin or any other agent of National from entering the property. The petition further alleged that it was necessary for the defendants to reduce the cotton compress to scrap iron by use of a welding torch because delay in removal would delay construction activities planned for the site. The last line of defendants' petition requests, "In the alternative, summary judgment on the main demand be entered against The National Companies and in Bridgewater's favor decreeing that Bridgewater and Boettner are the owners of the compress."
On January 28, 1980, defendants filed an answer to the original petition and on the same day there was a hearing in the trial court to show cause why the temporary restraining order, granted by the court on January 15, 1980 against National, should not be extended to a preliminary injunction to be effective during the pendency of the proceedings.
At this hearing in the district court it was the testimony of Bridgewater that the cotton press was a quarter of a million pound piece of steel that was formerly used to compress cotton into small bales; he also testified that he estimated that dismantling the machine piece by piece would take as many as six weeks. He also added he had never been contacted by Scullin regarding removal of the press and that he was never asked by that party for information in relation to removal of the press.
Edward Boettner, Bridgewater's partner, said that it was the assumption between Distribution Centers and their contractor that the press would be removed at the time of commencement of construction which was then imminent. Boettner stated he told Scullin he could have full cooperation from Distribution Centers as long as he could remove the press by the deadline and that he even discussed the proposed plans for disassembly and removal with Scullin's contractor. He emphasized that he had not given National any extensions of time nor had he authorized anyone else to do so. He said that he communicated with Scullin on a regular basis and at no time before the first week in January of 1980 did Scullin communicate any intentions to follow through and remove the press.
Stephen Dwyer, the attorney for the Boettner-Bridgewater project, said he never granted to Scullin an extension of time on the removal period nor did he instruct him to ignore the deadline, in spite of a mailgram introduced and written by Scullin supposedly "confirming" that such a statement had been made to him by Dwyer. Other mailgrams were introduced in which *32 Dwyer had suggested that Scullin have his moving contractor contact him, asked for a definite date for removal and dismantling, and emphasized that Scullin had had and continued to have authority to enter the property for removal of the compress. Dwyer added, however, that he was never contacted by Scullin in response to these statements.
Grant J. Bultman, project manager of construction to take place at the site of the cotton press, said he discussed removal of the press with Scullin's contractor, who estimated it would take 10 days or two weeks. He said the conversation took place approximately two weeks before the January 28, 1980 hearing and that removal of the press at the time of that conversation would not have impeded construction progress. He also said he did not ever impede or prevent anyone from National from coming on the property for that purpose.
A hearing on the defendants' motion for summary judgment took place in the district court on February 5, 1980. Presented to the court by National was an authentic act, dated December 13, 1979, which purported to be a sale by which National sold the subject cotton press to one "Saint German of Alaska Eastern Orthodox Catholic Church," located at 140 Main Street, Sctauket, New York, in consideration of the price of $1,000,000. The act of sale was signed by Scullin and one Irving Novick, who was described as the church's agent. The trial court also had before it an affidavit by Scullin insisting that he had been granted an extension of time by Dwyer, and copies of the mailgrams which issued between the parties.
We can find no merit in National's argument, on appeal, that the church was an indispensable party to the action in the trial court.
LSA-C.C.P. art. 641 states:
"Indispensable parties to an action are those whose interests in the subject matter are so interrelated, and would be so directly affected by the judgment, that a complete and equitable adjudication of the controversy cannot be made unless they are joined in the action.
"No adjudication of an action can be made unless all indispensable parties are joined therein."
In the case of Lilliedahl & Mitchel v. Avoyelles Trust & Sav., 352 So.2d 781 (La. App. 3d Cir. 1977), the court said at page 786:
"* * * A party is indispensable only when his absence necessarily would result in an impairment of substantial rights. State, Department of Highways v. Lamar Advertising Company of Louisiana, 279 So.2d 671 (La.1973). Defendant has failed to show how these proceedings would necessarily impair the rights of Lilliedahl's succession."
Additionally, regarding this issue, the court said in State, Dept. of Hwys. v. Lamar Adv. Co. of La., Inc., 279 So.2d 671, 677 (La.1973):
"We therefore conclude that parties should be deemed indispensable only when that result is absolutely necessary to protect substantial rights. A close factual analysis of the cases decided to date reveals that very few absent parties are absolutely indispensable to the litigation before the court. The court, by the shaping of its decree, may be able to avoid any possibility of prejudice to the rights of an absent party and still do justice to the parties before the court."
In the present case, the nature of the cotton press must also be considered in deciding whether the church was an indispensable party to the present action.
LSA-C.C. art. 466 states:
"Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
"Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached."
Since this law became effective on January 1, 1979, and the transfer between Distribution *33 Centers and National occurred on February 9, 1979 (although there is reference in the act of transfer that it is a ratification of an April 3, 1978 transfer to National), we hold that the above article is applicable to the status of the cotton press at the time of the transfer. The evidence establishes that the defendants' property would be damaged by removal of the press. Considering the nature of the press and its attachment to the property, we find that the press was part of the immovable prior to any attempted deimmobilization transfer from Distribution Centers to National.[3]
In this regard, LSA-C.C. art. 468, a codification of rules adopted by the courts, also states:
"Component parts of an immovable so damaged or deteriorated that they can no longer serve the use of lands or buildings are deimmobilized.
"The owner may deimmobilize the component parts of an immovable by an act translative of ownership and delivery to acquirers in good faith.
"In the absence of rights of third persons, the owner may deimmobilize things by detachment or removal."
The case of Bon Air Planting Co. v. Barringer, 76 So. 234 (La.1917), addressed itself to the issue of the rights of third parties when an immovable may be changed to the status of a movable, at page 235:
"The decisions of this court and the unanimous opinion of the French Commentators are to the effect that an immovable by destination, sold in good faith and removed from the realty to which it was attached, again becomes movable. See Bank v. Knapp, 22 La.Ann. 117; Weil v. Lapeyre, 38 La.Ann. 303. It would seem, then, that to mobilize a thing which has become immovable by destination, it is a necessary condition that the thing itself should in point of fact be removed from the realty. Laurent, in his treatise above quoted, vol. 30, No. 233, says:
`Vainly may the purchaser say that the sale alone mobilizes an immovable by destination; that is true between the parties, but it is not true so far as concerns the mortgage creditor, who has a real right in the thing, a right which belongs to him as long as the thing is attached to the soil. But the sale does not detach it from the soil, it [the sale] only mobilizes the thing between the parties, and the mortgage creditor is the stranger to this agreement. Even the good or bad faith of the parties is of no effect unless the thing has been placed in the possession of the vendee.'
"From these premises it follows also that an immovable by destination may not be mobilized and returned to its status as a movable, solely by the will or caprice of the owner, but that it must be separated and detached from the realty.
"It is true that in the case at bar, the sale was of the realty and not of the immovable by destination, but the effect is the same as if the sale had been of the immovable by destination and not of the realty, for the change of ownership of the one and not of the other merely changed one of the conditions necessary to immobilize by destination, that of ownership of both the realty and the thing in the same person. It did not alter the other condition, under which the thing remained upon and attached to the realty for its service and improvement."
In the present case no actual delivery was perfected from Distribution Centers to National after the February 9, 1979 transfer, a factor which, if present, would have completed transfer of title of the press to National as to third parties, in this case the church. Since the actual delivery was never accomplished, it was not a movable susceptible to a title transfer from National to a third party in the December 13, 1979 purported sale to the church.
We hold, therefore, that the church cannot be considered an indispensable party to the present suit between Bridgewater and *34 National regarding ownership of the cotton press itself; and adjudication by the court of that issue does not prejudice any action the church might have against National in regard to its failure to perform on the contract executed with that entity.
We further find no basis for plaintiff's argument that the defendants' motion for summary judgment on the plaintiff's main demand was premature. LSA-C.C.P. art. 966 states:
"The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed. The plaintiff's motion may be made at any time after the answer has been filed. The defendant's motion may be made at any time." (Emphasis ours.)
This court has previously addressed itself to this identical issue in Jacobs v. Beck, 141 So.2d 920, 921-922 (La.App. 4th Cir. 1962):
"Liberty Mutual contends that the case presents no issue of fact; that, accepting all of the allegations of the petition as true, the injury sued upon comes within the above quoted malpractice exclusion. Plaintiffs contend: (1) that the motion for summary judgment was improper and premature for the reason that the same cannot be filed by a defendant as an initial pleading; and (2) considering the petition in the light of the policy there is a genuine issue of material fact.
"Plaintiffs' first contention is without merit and is answered by LSA-Code of Civil Procedure Article 966 relative to the motion and procedure for summary judgment. After providing that the plaintiff may make the motion at any time after answer has been filed, it further provides that defendant's motion ` * * * may be made at any time.'"
Since the summary judgment was granted only on the plaintiff's main demand, dismissing his case and declaring the defendants owners of the cotton press, as authorized by LSA-C.C.P. art. 1915, this court holds that the filing of that motion as part of the defendants' initial pleadings was not premature.
Neither can we find merit in plaintiff's further allegation that the granting of summary judgment was not appropriate. LSA-C.C.P. art. 966 also states:
"The motion for summary judgment shall be served at least ten days before the time specified for the hearing. The adverse party may serve opposing affidavits prior to the day of the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law."
In explanation of the above article, this court stated in Metropolitan Bank of Jefferson v. Summers, 257 So.2d 179 (La.App. 4th Cir. 1972), at pages 180-181:
"It is well settled in Louisiana jurisprudence that a summary judgment will not lie where a genuine material issue of fact exists. Glass v. Vista Shores Club, 221 So.2d 304 (La.App. 4th Cir., 1969); Joiner v. Lenee, 213 So.2d 136 (La.App. 3rd Cir., 1968), writ refused, 252 La. 960, 215 So.2d 129; Roy & Roy v. Riddle, 187 So.2d 492 (La.App. 3rd Cir., 1966), writ refused, 249 La. 724, 190 So.2d 236; Acadia-Vermilion Rice Irr. Co. v. Broussard, 185 So.2d 908 (La.App. 3rd Cir., 1966).
"However, the jurisprudence equally asserts the purpose of the summary judgment procedure is `to minimize and discourage the judicial urging of well pleaded but frivolous claims'. Perry v. Reliance Insurance Co. of Philadelphia, 157 So.2d 903, at 906 (La.App. 1st Cir., 1963). The court in Perry also quoted, at page 908, from Duplechain v. Houston Fire & Casualty Ins. Co., 155 So.2d 459 (La.App. 3rd Cir., 1963), that the defendant in a motion for summary judgment is `required to show that there is a real, not formal, controversy as to a material fact'.
"A summary judgment may be rendered if a scrutiny of the facts shows that issues presented need not be tried because *35 they are so patently insubstantial as to present no genuine issues. A mere formal allegation without substance will not preclude the rendering of a summary judgment. Brown v. B & G Crane Service, Inc., 172 So.2d 708 (La.App. 4th Cir., 1965), appeal after remand, 194 So.2d 746, writ refused, 250 La. 534 and 535, 197 So.2d 79 and 80; Wilkinson v. Husser, 154 So.2d 490 (La.App. 1st Cir., 1963), writ refused, 245 La. 60, 156 So.2d 603."
Plaintiff's assertion of the sale of the press transacted between himself and the church is an issue irrelevant to the summary judgment rendered in the present case because title to the press itself could not have passed in that sale from National to the church, who was not a party to the original transfer between Distribution Centers and National. The issue of whether National had in fact been granted an extension by Dwyer, who plaintiff alleged was authorized to act as an agent for Bridgewater in that respect, had been denied by Bridgewater, Boettner and Dwyer in their testimony at the hearing on the restraining order. The district court judge was free to consider this testimony in his granting of summary judgment. The record in its entirety leads us to conclude, as did the trial judge, that there was no issue of material fact sufficient to require a trial on the merits and that, therefore, defendants were entitled to judgment in their favor as a matter of law.
Accordingly the district court judgment is affirmed in all respects.
AFFIRMED.
NOTES
[1] The National Companies is a Mississippi partnership, which has Kenneth C. Scullin as its general partner.
[2] The National Companies and Gulf Coast Industrial Properties Distribution Centers is a Louisiana partnership in commendum comprised of two other partnerships. The National Companies, and Gulf Coast Industrial Properties (a Mississippi partnership of which Bridgewater is the general partner).
[3] The same result can be reached based on Article 468 of the Louisiana Civil Code of 1870, which states that things that the owner of a tract of land or a building has placed upon it for its service and improvement are "immovables by destination."