466 So.2d 504 (1985)
Lanny Gayle HEATER, Plaintiff-Appellant,
v.
TEXAS GAS & EXPLORATION CORPORATION and Texas Gas Transmission Corporation, Defendants-Appellees.
No. 84-216.
Court of Appeal of Louisiana, Third Circuit.
March 6, 1985.
Rehearings Denied April 17, 1985.
*505 Jones, Jones & Alexander, J.B. Jones, Jr., for plaintiff-appellant.
Raggio, Cappel, Chozen & Berniard, Richard A. Chozen, Plauche, Smith & Nieset, Michael McNulty, III, Lake Charles, for defendant-appellee.
Before DOUCET, LABORDE and YELVERTON, JJ.
YELVERTON, Judge.
Lanny Gayle Heater, working offshore as a roustabout on a stationary platform in the Gulf of Mexico, was injured on April 24, 1982, when a scaffold on which he was standing fell. He was employed by Reading & Bates Drilling Company, an offshore drilling contractor. He brought a third party tort action, based on strict liability under Articles 2317 and 2322 of the Louisiana *506 Civil Code, against the owner of the platform, Texas Gas Exploration Company, and its insurer Aetna Casualty & Surety Company. Gary Blackorby and his employer, Greer Consultants, Inc., and their insurers, The Home Indemnity Company and Mission National Insurance Company, were also named defendants. The case against them was based on Blackorby's negligence, which was also a basis for the suit against Texas Gas.
The trial judge granted summary judgment in favor of all defendants, dismissing plaintiff's claims, holding that there was no genuine issue of material fact and that defendants were entitled to judgment as a matter of law. Plaintiff appealed. We reverse and remand.
The summary judgment evidence (the pleadings and five depositions) is not complicated. Reading & Bates was operating under a contract with Texas Gas, the owner of the platform, to drill wells. Plaintiff was a roustabout for Reading & Bates. Gary Blackorby was a drilling consultant, hired by Greer Consultants, Inc., pursuant to its contract with Texas Gas to provide a consultant for the overall operation of the platform; Blackorby was the "company man."
Curtis D. Shultz was the toolpusher of the Reading & Bates crew of which plaintiff was a member. Dallas Grice was the crane operator, and Randy Crosby and David Duhon were the other roustabouts in the crew.
On April 24, 1982, Shultz ordered the crane operator, Grice, to move some 2" × 4" and 3" × 12" boards of various lengths to an overhead rack which was part of the Texas Gas platform. Shultz said he made the decision to move the boards.
Part of the Reading & Bates drilling rig was a salt water line which was used to draw salt water from the Gulf for cooling motors and operating toilets. The salt water line rose vertically to a point about eight feet above the deck, where it turned on a horizontal plane. On this plane it made an L before it continued to the other areas of the rig. The salt water line was secured by a steel brace which was welded to the platform. A 3" × 12" × 20' board lay across the sides of the L. No deponent knew when or by whom this board was placed there. The board was not secured to the salt water line. Men stood on this board in the process of moving material from the deck to the overhead rack, which was used for storage.
On the day of the accident, Grice relayed the order to the three roustabouts, plaintiff, Crosby, and Duhon, to move the boards on the deck to the overhead rack. Plaintiff and Duhon climbed upon the board that lay across the salt water line, while Crosby raised the boards up to them with a forklift. Something happened, the scaffold board came off the water line, Duhon jumped down to the deck without injury, and plaintiff fell and was injured.
Plaintiff's petition alleged:
"The accident above described was caused jointly by the fault of defendant, Texas Gas, its agents, servants and employees, Greer Consultants, Inc., and Gary Blackorby, their agents, servants and employees, as follows:
1. Defendants are liable for ruin and a defective thing under the provisions of the Louisiana Civil Code.
2. Failure to properly inspect facilities and failure to inspect and maintain the scaffold, and failure to prevent Reading & Bates from using the unreasonably dangerous scaffold on the premises.
3. Carrying on a dangerous operation.
4. Failure to provide a safe place to work.
5. Exposing plaintiff to ultrahazardous and dangerous conditions."
The statutory and jurisprudential rules regarding summary judgment procedure are summarized in Whitney v. Mallet, 442 So.2d 1361 (La.App. 3rd Cir.1983), writ denied, 445 So.2d 437 (La.1984), in the following language:
"A motion for summary judgment should be granted only if the pleadings, *507 depositions, answers to interrogatories, admissions on file, together with the affidavit show no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. C.C.P. art. 966. Papers supporting the position of the party moving for summary judgment are to be closely scrutinized, while the opposing papers are to be indulgently treated. Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981). A summary judgment is not appropriate when it is based upon affidavits and accompanying pleadings and other documentary evidence to establish subjective facts such as motive, intent, good faith or knowledge. Mecom v. Mobil Oil Corporation, 299 So.2d 380 (La.App. 3rd Cir.1974), writ ref. 302 So.2d 308 (La.1974), Fontenot v. Aetna Insurance Co., 225 So.2d 648 (La. App. 3rd Cir.1969). Only when reasonable minds must inevitably concur is a summary judgment warranted and any doubts should be resolved in favor of a trial on the merits. Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367 (La.1976); Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963); Clement v. Taylor, 382 So.2d 231 (La.App. 3rd Cir.1980).
"Nor is summary judgment appropriate as a vehicle for the disposition of a case, the ultimate decision in which will be based on opinion evidence or the judicial determination of subjective facts. Butler v. Travelers Insurance Co., 233 So.2d 271 (La.App. 1st Cir.1970); Smith v. Preferred Risk Mutual Ins. Co., 185 So.2d 857 (La.App. 3rd Cir.1966)."
And in Bertrand v. Howard Trucking Co., Inc., 406 So.2d 271 (La.App. 3rd Cir. 1981), writ denied, 410 So.2d 763 (La.1982), this court stated that:
"The summary judgment procedure is designed principally to decide issues of law in cases where the material facts are not in dispute. The procedure is therefore seldom appropriate in negligence cases in which the decision turns on a determination of whether or not a defendant's conduct constitutes a tort. Such a determination usually involves a factual dispute. Cosse v. Schwegmann Brothers Giant Supermarkets, 336 So.2d 1074 (La.App. 4 Cir.1976); Continental Casualty Company v. McClure, 313 So.2d 260 (La.App. 4 Cir.1975)."
The briefs filed with this case were primarily addressed to the issues of liability under La.Civil Code art. 2322, which reads:
"The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
and Article 2317, which reads:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
Liability under Article 2322 depends upon three elements: (1) there must be a building; (2) defendant must be its owner; and (3) there must be a ruin caused by a vice in construction or a neglect to repair the building. Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1978).
The trial court found that the first two requirements for the application of Article 2322 to Texas Gas were met, but that the third, or "ruin" requirement, was not satisfied, because neither the board upon which the plaintiff was standing nor the salt water line failed.
The principle of legal fault underlying both Articles 2317 and 2322 is explained in Entrevia v. Hood, 427 So.2d 1146 (La. 1983), as follows:
"This court has recognized that the same principle of legal fault underlies both Article 2317 and 2322 (as well as Articles 2318, 2319, 2320 and 2321). In Loescher v. Parr, 324 So.2d 441, 446-47 (1976), we summarized this principle recognized in favor of an injured person himself without fault:
`When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible *508 under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others. The fault of the person thus liable is based upon his failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others.
`This jurisprudence recognized that the injured person must prove the vice (i.e., unreasonable risk of injury to another) in the person or thing whose act causes the damage, and that the damage resulted from this vice. Once this is proved, the owner or guardian responsible for the person or thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force.
The legal fault thus arising from our code provisions has sometimes been referred to as strict liability.'
"And in Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1979), this court reaffirmed that under Article 2322 the owner of a building has a non-delegable duty to keep his building and its appurtenances in repair so as to avoid unreasonable risk of injury to others. Id. at 1292.
"Accordingly, in order to recover in strict liability under Article 2317 or 2322 against the owner of a building, the injured person must prove that the building or its appurtenances posed an unreasonable risk of injury to others, and that his damage occurred through this risk. Upon proof of these elements, the owner is responsible for the damages, unless he proves that the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. The owner is absolved from his strict liability neither by his ignorance of the condition of the building, nor by circumstances that the defect could not easily be detected. Olsen v. Shell Oil Co., supra; Loescher v. Parr, supra."
The building in Entrevia was isolated, unproductive, rural property; its steps collapsed causing injury; these circumstances did not constitute an unreasonable risk to others. Like the building in Entrevia, the building in the present case was isolated. But there the similarity ends. The building here was productive. It was a self-contained, compact, highly organized and efficient physical structure designed as both a work place and a living place; its economic function was the production of oil. The risk posed and harm threatened by defects for ruinous conditions on such structures is great.
The trial judge, relying on Entrevia, was convinced that "the simple placing of a board across an object does not convert the object into a scaffolding structure." In the trial court's written opinion, he stated that if the apparatus had been designed to function as a scaffolding structure, "its quality would be tested under a different standard." Although it was being used as a scaffold at the time of the accident, the trial court apparently believed that because the board was not secured to the pipe, it could not be regarded as a scaffold.
We are unable to say that there is such a difference between a board laid across a pipe and secured to it, and one laid across a pipe and not secured to it, that because of that difference one is a scaffold and the other is not. The scaffold upon which the *509 plaintiff was working fell, collapsed or gave way because it was inadequately secured. In a case similar in its facts, Fonseca v. Marlin Marine Corp., 410 So.2d 674 (La.1981), a scaffold made of boards (unattached) across second floor joists flipped, causing one of the carpenters engaged in the construction of a barn to fall. The Court considered whether the scaffold could be called a ruin, noting that the term had never been precisely defined and that under its most restrictive interpretation it referred only to the actual fall, collapse, or giving way of a building or a substantial component thereof, while at other times the term was broadly construed to refer to defects in parts or appurtenances to structures. The court concluded, on the original hearing, that the defective scaffolding was a ruin, making the owner liable under Article 2322. On rehearing, the court expressed doubt as to the application of Article 2322, but not because the scaffolding was not a ruin, in the sense of being a vice in the original construction. Rather, having the benefit of the trial record, the court concluded as a fact that the boards were merely an apparatus used in performing the construction and that they were never intended as a permanent part of the building. The court noted that, in fact, the boards were removed after the hayloft was completed. (In the present case, photographs taken months after the accident showed a similar, or perhaps the same, board resting on the same pipe, the only apparent difference being that the pictured board was secured to the pipe.)
In the present case there is nothing in the record to show how long the board on which plaintiff stood had been there. Its function was clear: it served as a scaffold. Although it would have been safer tied down, and it would have had more of the appearance of permanence, the fact that it was not secured, and looked temporary, does not mean it was. For all the evidence shows, it may have been a scaffold for a long time. The photographs attached to the depositions suggest it remained a scaffold for a long time after the accident. The overhead racks being used for storage may not have been built for that purpose, but they had been converted to that use. As the company man, Blackorby, said in his deposition: "I don't know what those racks are there for. But that's a good storage place...."
It is a jury question whether the scaffolding structure was a part of the platform, and a critical element in that determination is the degree of permanence of the scaffold, at present a disputed issue of material fact. We cannot resolve that question by simply concluding that a board laid on a pipe is not a good design for a scaffold. The overhead rack, though not designed for storage, had long functioned as one, and its "quality" therefore can be tested as a storage rack. Similarly, it is for a jury to determine whether the extent and duration of useits permanenceof the scaffold, was such as to require that its quality be tested as a scaffold, and not as a random conjunction of a normal piece of pipe and a normal piece of board.
For however long the overhead storage rack had been used for that purpose, just so long was it necessary to provide a means of human access to it, and the makeshift scaffold apparently performed that function. The board need not necessarily have been secured to the pipe to make the junction permanent. A jury might find that the scaffold was a permanent part of the building. Fonseca v. Marlin Marine Corp., supra. It is a question of fact whether it is a ruin, under La.Civil Code art. 2322, and a defect, under article 2317. The jury could find that the condition presented an unreasonable risk of injury.
Texas Gas argues that the scaffold was not an appurtenance and therefore not a part of the building, relying on Steele v. Helmerich & Payne Intern. Drilling Co., 738 F.2d 703 (5th Cir.1984), and that court's interpretation of our Civil Code article 466. In that case a "stabbing board" in temporary use fell from a drilling rig, injuring a workman. That court found, on the basis of complete stipulated facts, that the stabbing *510 board was not an appurtenance of the platform because (1) it was not attached, and (2) it was not permanent. The court found the requirement of permanent attachment in the following language taken from Civil Code article 466: "Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached."
As stated earlier, we do not consider the "attachment" feature controlling. The boards in the Fonseca case were not nailed down or otherwise attached to the joists, yet the Louisiana Supreme Court did not consider the resulting scaffold to be any less a part of the building for that deficiency. It is also significant that Article 466 became effective January 1, 1979, and the Fonseca case was decided in 1981, and the Code article was not mentioned in Fonseca. We do not consider it applicable.
The primary distinction of Steele, however, is that it was a stipulated fact that the stabbing board was only temporary and would have been removed in one or two days.
Summary judgment was likewise inappropriate in the instant case for the negligence theory of recovery. In the summary judgment evidence there is a genuine issue of material fact concerning the question of the ambit of Gary Blackorby's duty to plaintiff.
The trial court found that Gary Blackorby had no personal connection with the incident in which plaintiff was injured, and also that no duty to plaintiff was breached by Blackorby or by Texas Gas or Greer Consultants, Inc., through Blackorby. This was error under summary judgment rules, because Blackorby's deposition raises a genuine issue of material fact concerning the ambit of his responsibility on the drilling platform. He stated that he walked in the vicinity of the accident every day. He also said that safety inspections were part of his job, after first stating that he was not responsible for safety on the platform. He stated that he was "responsible for all the drilling activity that takes part on the rig as far as from the rotary table down that's the responsibility of the oil company...." He also stated that he had no "jurisdiction over the supervision of the people" but that he works "directly with the management and the staff people on the rig for the contractor." Although it was denied by other deponents, it was plaintiff's testimony that Blackorby would occasionally issue direct orders to the Reading & Bates crew. These discrepancies in the summary judgment evidence raise a genuine issue of material fact on the issue of negligence.
For these reasons the summary judgment is reversed and set aside, and the case is remanded to the district court for further proceedings, costs of this appeal to be borne by appellees Texas Gas and Greer Consultants, Inc., equally.
REVERSED AND REMANDED.

ON REHEARING
PER CURIAM.
All defendants-appellees applied for a rehearing. The application of Texas Gas and Aetna says that we erroneously interpreted the scaffold photographs attached to the depositions as indicative of the presence of the scaffold for a long time after the accident. The application for rehearing tells us that the scaffold in the photographs was put there for demonstrative purposes solely for the taking of the depositions.
Although that explanation does not appear in the record, and is only vaguely intimated in the briefs, that may be so. Nevertheless, it does not affect our opinion. The material fact in dispute is whether the scaffold was part of the platform at the time of the accident, a determination that depends essentially on the circumstances of its presence before the accident, and not after it.
The applications for a rehearing are denied.